## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DARLENE D. WINN,

        Plaintiff,

v.

K.C. REHABILITATION HOSPITAL,
INC., d/b/a MID AMERICA
REHABILITATION HOSPITAL,

        Defendant.

Case No. 13-2423-DDC-TJJ

## MEMORANDUM AND ORDER

Plaintiff Darlene D. Winn brings this employment discrimination and retaliation action against her former employer, K.C. Rehabilitation Hospital, Inc., d/b/a Mid America Rehabilitation Hospital. Plaintiff worked for defendant as a full-time unit secretary. After new management was hired in 2012, plaintiff alleges that they treated her unfairly because of her race by criticizing her work performance, making negative comments to her, applying the dress code differently to her than to other coworkers, prohibiting her from working overtime, and eventually terminating her employment. Plaintiff brings this action under Title VII, 42 U.S.C. § 2000e *et seq.*, asserting claims for racially hostile work environment, retaliation, and retaliatory discharge. This matter comes before the Court on defendant's Motion for Summary Judgment (Doc. 75). After considering the parties' arguments and viewing the evidence in the light most favorable to plaintiff, the Court grants defendants' Motion for Summary Judgment for the reasons explained below.

1

## I.      Uncontroverted Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 72), or they are uncontroverted and stated in the light most favorable to plaintiff, the nonmoving party. *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1096 (10th Cir. 1999).

### *Plaintiff's Employment with Defendant*

Defendant operates Mid America Rehabilitation Hospital in Overland Park, Kansas ("the Hospital").  Plaintiff, an African-American woman, began working for defendant at the Hospital on September 21, 2008, as a part-time unit secretary.  On September 20, 2009, plaintiff became a full-time unit secretary.  At the times relevant to this lawsuit, plaintiff's working hours were Monday through Friday from 6:30 a.m. to 3:00 p.m. with a 30 minute break for lunch. Defendant employed one other full-time unit secretary at the Hospital during plaintiff's employment.  That other full-time unit secretary was Stacey Menchue, a Caucasian female, who continues to work at the Hospital today.

When plaintiff was hired, she received a copy of her job description which contains a list of "essential job functions" that is approximately four pages long.  Ms. Menchue trained plaintiff for the part-time unit secretary position.  As part of that training, plaintiff sat next to Ms. Menchue on the East Wing and watched Ms. Menchue perform her job duties.  Ms. Menchue then explained to plaintiff the job duties she was performing and how she was performing them.

### *Defendant Hires New Management at the Hospital*

The Hospital hired Amy McKay as Chief Nursing Officer ("CNO") on June 30, 2012.  In that position, Ms. McKay was responsible for supervising the Hospital's clinical services group, which includes nurse managers, nurses, techs, respiratory therapists, unit secretaries, and a staffing coordinator.  Ms. McKay understood that the Hospital had experienced significant

turnover in the clinical services management team in the last several years and that the Hospital was seeking a stable management team to provide consistent leadership for the clinical services group. Ms. McKay also understood the prior management team's enforcement of Hospital policies was lax and its leadership of the clinical services group was inadequate.

Ms. McKay hired two nurse managers to report directly to her. She hired Angelina Sherman in September 2012, and she hired Sara Pfeiffer in November 2012. In September and October 2012, plaintiff reported directly to Ms. Sherman and indirectly to Ms. McKay. Beginning in November 2012, plaintiff began reporting directly to Ms. Pfeiffer and indirectly to Ms. McKay. Employees who reported to Ms. Pfeiffer and Ms. Sherman could go to either nurse manager for assistance even if the employee technically reported to the other nurse manager. On January 21, 2013, the Hospital hired Troy Dedecker as Chief Executive Officer ("CEO").

### Plaintiff Sends an Email About a "Black and White Problem"

On September 27, 2012, Ms. McKay and Ms. Sherman, as newly-hired leaders, held a meeting with the clinical staff to discuss their expectations for them. At that meeting, plaintiff said: "I can't be like Stacey Menchue. I'm going to have to do my job the way I—the way I want to do it." Doc. 76-1 at 363–64 (Winn Dep. 362:22–363:19). When she felt herself becoming upset, plaintiff walked out of the meeting.

The following day, plaintiff sent an email to Ms. McKay stating that her comments at the meeting had nothing to do with Ms. McKay or Ms. Sherman. She wrote that she was "tired of these nurses acting like things are so t[ough] and the order never been the[ir] responsibility." Doc. 76-11 at 2. Ms. McKay interpreted plaintiff's statement that "the order never been the[ir] responsibility" to mean that plaintiff believed order transcription was primarily the nurses' responsibility. Plaintiff also described in her email several examples of how some of the nurses

3

seemed to prefer working with Ms. Menchue over plaintiff.  Plaintiff wrote she and others "see [it as] a black and white [problem] and it[']s getting bad."  *Id.*  Plaintiff does not know when she started to believe, or how long before September 27, 2012, she started to believe, the nurses were comparing plaintiff to Ms. Menchue.  No one ever told plaintiff she should be more like Ms. Menchue, but she believed others were comparing her to Ms. Menchue based on certain comments and actions—such as nurses asking Ms. Menchue to respond to questions that plaintiff had already answered to see if plaintiff's answers were correct and comments that Ms. Menchue was faster at her job than plaintiff.

Plaintiff testified in her deposition that her reference in the email to the "black and white problem" stemmed from her belief that others thought she did not have enough knowledge to run her unit because she is African-American.  But plaintiff testified that she could not recall a single instance of someone saying something to her about her race.  Plaintiff also could not remember any instance when someone said that her race had anything to do her job performance.  Plaintiff testified that her concerns about a "black and white problem" were based on a general "feeling."  Plaintiff also testified that "other employees" shared her view about a "black and white problem," but plaintiff was unable to name any person who shared that view.

### Annual Performance Reviews

The Hospital conducts annual performance reviews of its employees.  The review period for the annual assessment runs from July 1 through June 30 of the following year.  Employees receive a rating from Level 1 to Level 5 on various responsibilities and attributes as well as an overall review score of Level 1 to Level 5.  A Level 1 rating is defined as:  "Does not meet expectations of the position.  The result of this overall rating is placement on 'probation' for a period not to exceed 90 days.  Unsatisfactory progress at any time during the probationary period

will normally result in termination of employment." Doc. 76-6 at 4.  A Level 2 rating is defined as: "Partially meets expectations of the position.  Improvement or additional experience is needed in one or more areas." *Id.*  A Level 3 rating is defined as: "Consistently meets expectations of the position.  Performs at the level expected of a fully qualified and experienced employee." *Id.*  A Level 4 rating is defined as: "At times exceeds expectations of the position. Outstanding performance that at times exceeds expectations." *Id.*  A Level 5 rating is defined as: "Consistently exceeds expectations of the position.  Accomplishments include innovation, leadership and commitment to the overall success of the work group and Company." *Id.*

Stacey Menchue (the other full-time unit secretary) received her annual performance evaluations at different times over the years, generally between October and December.  Ms. Menchue received an overall annual performance review rating of "Level 4" every single year throughout her employment.

Plaintiff received her 2009 annual review (which covered the beginning of her employment to June 30, 2009) on September 11, 2009.  Plaintiff received an overall score of "Level 3" on her 2009 annual review.  Plaintiff received her 2010 annual review (which covered the July 1, 2009 to June 30, 2010 review period) on October 21, 2010.  Plaintiff received an overall score of "Level 3" on her 2010 annual review.  Plaintiff received her 2011 annual review (which covered the July 1, 2010 to June 30, 2011 review period) on or around October 20, 2011. Plaintiff received an overall rating of Level 3 on her 2011 annual review.  That review also rated plaintiff as a "Level 2" in the area of "Job Tasks," and stated: "please ensure staff know when there are stat orders on the charts." Doc. 76-8 at 2.  That review also listed "Order Transcription" as an "Individual Goal for the Next Performance Period," with the following three

"Action Steps to Develop / Comments":  "(1) accurate transcription of orders; (2) timely transcription of orders; (3) notifying of RN when stat orders are placed on chart."  *Id.* at 4.

Ms. McKay helped write the 2012 evaluations for plaintiff and Ms. Menchue.  When drafting the annual reviews, Ms. McKay considered her own observations of plaintiff and Ms. Menchue's work, she looked at their prior annual reviews, and she had employees complete peer reviews for each another.  Ms. McKay understood the comment in plaintiff's 2011 annual review about stat orders, plaintiff's rating of Level 2 in "Job Tasks," and the "Individual Goals" and "Action Steps" to refer to plaintiff's work on order transcription.  She also understood them to mean that prior management prioritized accurate and timely transcription of orders and had a concern with plaintiff's performance in that and other areas.

The Hospital uses the phrase "taking off orders" or "pulling orders" to describe the first four items in the "Job Tasks" category of the annual review form:  (1) "Maintains a complete and accurate medical record for all patients, utilizing appropriate labeling system;" (2) "Communicates all pertinent information to the clinical team or appropriate individual;" (3) "Accurately transcribes medical orders in a timely manner providing copies to other disciplines as appropriate;" and (4) "Accurately copies the medical record as required."  Doc. 76-6 at 2.  The job tasks on the form are not numbered, however, and do not provide a listing of their priority.  But Ms. McKay considered order transcription/taking off orders to be a priority task for unit secretaries.  And Ms. McKay believed plaintiff was the only unit secretary or nurse at the Hospital who did not understand the order of responsibility for taking off orders.

Mr. Dedecker described "the typical process" for taking off orders was "a physician writes an order, the unit secretary has to take off that order and enter it in.  At different periods throughout the day, nurses will come behind the unit secretary to verify that all of the orders

were initially taken off and verify that they've been entered correctly, and then there's that five

o'clock chart check in addition to that.  So that's, like, the third check.  It's all about redundancy

for patient safety.  The front line was the unit secretary, then the initial backstop is the nurses,

and then the third is that five o'clock chart check."  Doc. 76-5 (Dedecker Dep. 60:1–16).  Mr.

Dedecker believed that failure to take off orders timely and accurately could cause patient safety

issues, such as a delay in patient care or misapplication of a medicine.

According to plaintiff, since she first started working at the Hospital, she had been told

that the nurses were also responsible for pulling orders.  Plaintiff claims that she spent a good

portion of her day pulling orders on the West Wing, where she worked, as well as the East Wing,

where Ms. Menchue worked, and the South Wing, which did not have a unit secretary assigned

to it.

Plaintiff received her 2012 annual review (which covered the July 1, 2011 to June 30,

2012 review period) on October 19, 2012.  Plaintiff received an overall review score of Level 2

on that review.  Ms. McKay and Ms. Sherman rated plaintiff as a "Level 2" in the area of "Job

Tasks" on plaintiff's 2012 review (which was the same rating plaintiff received in 2011).  Ms.

McKay and Ms. Sherman also included the following comments in plaintiff's 2012 review about

taking off orders and job performance:  "[n]ot effective at communicating stat orders to nurses;"

"[n]eeds better time management so that scheduling of appointments can be better managed

along with other expected tasks;" and "[n]eeds to improve ability to multitask through unit

secretary responsibilities."  Doc 76-9 at 5–6.  Ms. McKay and Ms. Sherman also stated in

plaintiff's 2012 review that she "[n]eeds to work more effectively with other professional staff

assigned to the unit;" "[n]eeds to improve upon communicating more effectively with her peers;

often comes across unprofessionally and displays a lack of respect for other licensed personnel

employed by [the Hospital]." *Id.* at 6.  Ms. McKay and Ms. Sherman reiterated "Order

Transcription" as an "Individual Goal[ ] for the Next Performance Period" as well as the same

three "Action Steps" plaintiff had received in 2011 ("accurate transcription of orders," "timely

transcription of orders," and "notifying of RN when stat orders are placed on chart").  *Id.* at 7.

Plaintiff's 2012 review added "Communication" as another "Individual[ ] Goal for the Next

Performance Period" and included the following "Action Steps:"  "(1) Display greater respect

when communicating with peers; (2) Ask for help or guidance when overwhelmed and not sure

how to prioritize tasks."  *Id.*

### Plaintiff's Meeting with Ms. McKay and Ms. Sherman about her Annual Review

On October 19, 2012, plaintiff met with Ms. McKay and Ms. Sherman in Ms. Sherman's

office to discuss her 2012 annual review.  Plaintiff testified in her deposition that she had the

following concerns about her 2012 annual review and the October 19, 2012 meeting:

(1) she believed she should have received a final evaluation of Level 3 or above; (2) she thought

Ms. McKay and Ms. Sherman were disrespectful, accusatory, and negative in the annual review

meeting and that they interrogated her; (3) she thought Ms. McKay and Ms. Sherman spoke to

her in a disrespectful tone of voice; (4) she believed Ms. McKay and Ms. Sherman made her feel

small and like one of the worst employees; (5) she believed only Ms. Sherman should have

attended the annual review meeting, not both Ms. Sherman and Ms. McKay, because "everybody

else" had only one person at his or her review meeting; (6) Ms. Sherman called plaintiff a "liar"

because she denied an incident where a nurse complained to Ms. Sherman that plaintiff had been

disrespectful to the nurse and had made the nurse cry although Ms. Sherman never asked

plaintiff her side of this story; and (7) plaintiff left the meeting in tears.  Plaintiff also testified

that she felt Ms. McKay and Ms. Sherman's criticisms of her were unfair because they had never really worked with her.

Although plaintiff complained that "everyone else" had only one person at his or her review meeting and she testified that other people told her that they did not have two managers in their 2012 annual review meetings, she was unable to identify any such employee by name. She also admitted that she had no personal knowledge of who attended any other employee's annual review meeting. But plaintiff recalls having only one manager attend all of her prior review meetings from 2009 through 2011.

Plaintiff asserts that she first experienced discrimination or harassment during her employment on October 19, 2012, the day she met with Ms. McKay and Ms. Sherman to discuss her annual review. She also claims that this was the first time she had any concerns or problems with Hospital management. Plaintiff believed her 2012 annual performance review was based on her race because Ms. Menchue received a higher score on her 2012 annual performance review than plaintiff did. But plaintiff believes she and Ms. Menchue were performing at the same level, and she points out that she covered Ms. Menchue's work when she was on leave for several months after undergoing back surgery. Plaintiff takes issue with her review because, among other things, it fails to include any positive comments about her extra effort when Ms. Menchue was out on leave, including a time when plaintiff came to work on a Saturday to correct billing errors made by another person covering Ms. Menchue's work. Plaintiff said she considered the criticism that she received on this review because she had never received a review that made her feel like she did not know her job, but she also disagreed that her performance warranted a Level 2 score.

On November 8, 2012, plaintiff sent an email to Human Resources Manager Holly Ray stating that her 2012 review was unfair.  Plaintiff requested to attach to the review a letter describing her disagreement with the evaluation.  Plaintiff also asked Ms. Ray to tell Ms. Sherman "to stop the retaliation."

### Plaintiff Sends an Email to Ms. McKay About New Leadership

On February 26, 2013, plaintiff sent an email to Ms. McKay about the new leadership at the Hospital.  That email reads:

> Hi Amy I just letting you know that I have been coming to you with so many concern but I wanted to tell you that you Angie and Sara have did a big turn around in making this company professional cause it has been a big mess here.  I really glad yaw are own board I just wish you would have came in and learn me personally instead of hearing negative things about me.  Cause i"m a very hard working and loyalty to this company.  But I wanted to sit down with you and give you some situation I feel why you are turning this nursing unit around but I wanted to tell you I don't have any problem with you Angie or Sara you brought the right people on board.  and please tell me what I need to fix to make me a better employee to this company.

Doc. 76-12 at 2.  Ms. McKay interpreted plaintiff's email to mean that she was happy that Ms. McKay, Ms. Sherman, and Ms. Pfeiffer were at the Hospital, and that plaintiff believed they were doing good work and providing needed leadership for the clinical services group.

Plaintiff testified at her deposition her purpose in sending the email was to try to get along with the new management team and let them understand what kind of employee she was.  Plaintiff also testified that she was not honest when she made the following statements in the email:  (1) the new management team had made a big turnaround in making the company professional; (2) she was glad they were on board; (3) she did not have any problem with the new management team who brought the right people on board; and (4) it had been a big mess at the Hospital.  Plaintiff testified that she was honest when she wrote that:  (1) she wished Ms. McKay had gotten to know her personally instead of hearing negative things about her; (2) she

wanted to sit down with Ms. McKay to discuss some situations about why she felt Ms. McKay

was turning the nursing unit around; and (3) she wanted Ms. McKay to tell her what she needed

to fix to make herself a better employee.  Plaintiff said she believed that Ms. McKay, Ms.

Sherman, and Ms. Pfeiffer had heard negative things about her like she was not a good worker

and not a good secretary.  But plaintiff was unable to identify anyone who may have told them

such negative things.  Plaintiff also could not recall any additional things that she believed Ms.

McKay, Ms. Sherman, and Ms. Pfeiffer had heard about her.

### Plaintiff's Failure to Follow to the Dress Code

The Hospital has always required non-management nurses, techs, and respiratory

therapists to wear scrubs at work.  Around the beginning of 2013, the unit secretaries were the

only non-management employees in the clinical services group who did not wear scrubs at work.

At that time, plaintiff would dress up for work, wearing business casual clothes and high heel

shoes.  Ms. McKay decided around that same time that she wanted all the non-management,

clinical service employees to wear scrubs at the Hospital because she believed it would help the

public and patients better recognize who was a Hospital employee.  Indeed, she was aware that

some people had said they did not know that unit secretaries were Hospital employees because

they were not wearing scrubs.

On February 18, 2013, plaintiff sent an email to Ms. McKay which, among other things,

stated:

> And now I'm hearing that we getting scrubs for the secretary cause i'm not on the
> floor working i'm at a secretary desk I feel the nursing manger need to be in
> scrubs if that the case cause they help with the pysicians stats and other nursing
> concern. I just don't want to be tied down to a uniform everyday if the secretary
> have to wear it than it should be cross the board. I'm not happy with hearing
> about secretary in scrubs.

Doc. 76-13 at 2.  On March 9, 2013, Ms. McKay emailed plaintiff and Ms. Menchue to inform them of a change in the dress code, effective May 1, 2013, requiring unit secretaries to wear scrubs.  Ms. McKay told plaintiff and Ms. Menchue that they had two options for purchasing scrubs at the Hospital's expense:  (1) they could buy the scrubs themselves and submit a reimbursement form, or (2) they could select scrubs from website, provide their selections to Ms. McKay, and she would buy the scrubs for them.  Plaintiff complains that no one "sat her down" to explain the new dress code policy or the Hospital's expectations under the new policy.  No evidence exists that other employees received information beyond that provided in Ms. McKay's email on March 9, 2013, about the change in the dress code.

On March 18, 2013, plaintiff sent an email to Mr. Dedecker, the Hospital's CEO, stating that she believed casual clothes looked more professional than scrubs and that she felt there was no need for her, as a secretary, to wear a uniform.  Mr. Dedecker responded to plaintiff by email on April 4, 2013, stating that after reviewing the policy and meeting with leadership, he supported the dress code policy.  Plaintiff sent the following reply to Mr. Dedecker on April 10, 2013:  "Thanks for responding but one thing U and the leadership team needs to understand is value your employee cause it have fell off around here, With the decision making and not caring how your staff feels."  Doc. 76-15 at 2.  Mr. Dedecker wrote back to plaintiff on April 10, 2013:  "I am sorry to hear your feelings about leadership's understanding the value of employees or that there has been a change. . . . I feel the dress code is an important aspect of the image we want to portray to our patients.  I am sorry the decision is not what you had hoped for."  *Id.*

On April 26, 2013—several weeks after Ms. McKay sent the email on March 9, 2013, to plaintiff and Ms. Menchue about the dress code change—plaintiff replied to that email, stating she "cant afford to buy a uniform for work when its going to be reinburts later."  Doc. 76-14 at 2.

Plaintiff also stated:  "I barely can feed my kids so starting wed I won't come in until I can afford a uniform the company is making me wear."  *Id.*  Ms. McKay replied to plaintiff on April 26, 2013, reminding her that, in her March 9, 2013 email, she gave plaintiff and Ms. Menchue the option to submit an order for scrubs to Ms. McKay, who would then purchase the scrubs for the employees.  Ms. McKay also noted that she gave staff seven weeks' notice of the dress code changes and told plaintiff that she should have addressed the issue before then.  She also advised that all staff will be held to the same standard and warned plaintiff that she must follow the dress code or otherwise it could result in corrective action.  Eventually, Ms. McKay gave plaintiff money to purchase scrubs.

Beginning on May 1, 2013, plaintiff wore scrubs as the dress code requires.  She also wore stiletto heels with her scrubs between May 1 and May 10, 2013.  Before the change in the dress code, Ms. McKay had never told plaintiff that she could not wear heels to work.  And the new dress code did not prohibit wearing heels specifically, but it gave supervisors the discretion to determine appropriateness.  On May 10, 2013, Ms. McKay and Human Resources Manager Holly Ray met with plaintiff to counsel her that wearing heels with scrubs was not appropriate. Plaintiff does not recall Ms. McKay or Ms. Ray saying anything else to her at the May 10, 2013 meeting.  Plaintiff recalls that it was not a good meeting.  Plaintiff did not believe that wearing heels failed to comply with the dress code; instead, she thought she was "dressing up" her uniform.  She says that Ms. Sherman even complimented her for dressing up her uniform on one occasion.  However, after meeting with Ms. McKay and Ms. Ray, plaintiff began wearing shoes that complied with the dress code.

Ms. McKay never told any other employees, besides plaintiff, that his or her shoes were inappropriate under the dress code.  But Ms. McKay never saw any other employee wearing

inappropriate shoes, and she has never seen anyone wear high heels with scrubs.  Plaintiff

complains that other nurse and case managers wore heels at work, but these employees were not

required to wear scrubs under the dress code, like plaintiff.

On May 10, 2013, plaintiff emailed the corporate compliance group and Ms. Ray,

demanding a letter stating that she could not wear heels to work.  That same day, Ms. Ray

responded that she would provide plaintiff with a copy of the dress code policy, but also stated

that employees in the clinical department know heels are not part of a scrubs uniform.  Plaintiff

sent another email on May 10, 2013, to the corporate compliance group and Ms. Ray requesting

to have a witness from corporate attend any future meetings with plaintiff and management.

On May 13, 2013, plaintiff sent an email to Jackie Dye in the corporate compliance

group, stating that she knew Ms. McKay and Ms. Sherman were out to get her and that the

Hospital was violating her rights.  Plaintiff said that Ms. McKay had talked to her in a

disrespectful way at the May 10, 2013 meeting and accused plaintiff of telling a lie.  During her

deposition, plaintiff testified that she has no recollection of what she meant by any of the

allegations in her May 13, 2013 email to Ms. Dye.  Ms. Ray requested to meet with plaintiff on

May 16, 2013, to discuss the dress code policy.  Plaintiff initially refused to meet with Ms. Ray.

Plaintiff testified that all she asked Ms. Ray to do is give her a copy of the policy stating in

writing that she cannot wear heels at work.

### *Application of the Dress Code Policy*

As noted above, the dress code provides supervisors with discretion to determine

appropriateness.  The dress code policy states that the Hospital may send staff home to change

clothing if they arrive to work in attire that does not comply with the dress code.  The policy also

states that staff may be subject to disciplinary action for failing to comply with the dress code.

14

After the Hospital changed the dress code, Ms. Menchue came to work in a long-sleeved t-shirt on one occasion.  Ms. McKay believed Ms. Menchue's t-shirt did not comply with the dress code.  Ms. McKay counseled Ms. Menchue that her t-shirt was not appropriate.  Afterwards, Ms. Menchue followed the dress code.  Ms. Menchue never wore high heels or stilettos to work.

In July 2013, the Hospital amended the dress code to prohibit heels specifically and to allow for sleeveless shirts.  Plaintiff was hurt and upset about this policy change, and she felt that she was singled out because the change specifically prohibited wearing heels.  On July 29, 2013, plaintiff sent an email to Jackie Dye, Holly Ray, and Troy Dedecker advising that she was upset and hurt by the amendments to the dress code.

### Plaintiff Files a Charge of Discrimination

On March 22, 2013, plaintiff sent an email to Jackie Dye and Holly Ray complaining about her management team, suggesting that the Hospital was trying to get rid of her, and asking whether she should report her complaints to the Equal Employment Opportunity Commission ("EEOC").  Ms. Ray responded to plaintiff's email, letting her know that the Hospital takes her concerns seriously and setting up a time to meet with plaintiff.  On March 25, 2013, plaintiff sent an email to Holly Ray cancelling their meeting because plaintiff did not want to talk about her concerns, and she claimed that "people" do not like to talk to Human Resources for fear of retaliation.

On May 6, 2013, plaintiff filed a charge of discrimination with the EEOC, alleging race discrimination and retaliation.  Plaintiff stated in that charge of discrimination that the earliest date of discrimination was October 19, 2012.  Plaintiff also checked the box stating that the discrimination was a continuing action.  Plaintiff contends that, after she filed the charge of

discrimination, management started treating her worse.  She alleges that her supervisors would

not even speak to her or look at her.  She claims they stopped communicating with her and

stopped talking to her.  This lack of communication continued through the duration of plaintiff's

employment.  Plaintiff also contends, though, that she had a lot of meetings with her

management team after she filed her EEOC charge.  Plaintiff sent an email to Jackie Dye in

corporate compliance on May 17, 2013, complaining that her managers were applying the dress

code differently to her than it did to Caucasian employees and referencing her filing of an EEOC

complaint.  Mr. Dedecker asserts that he first learned about plaintiff's charge of discrimination

on May 24, 2013.

Plaintiff received a Right to Sue Letter from the EEOC on May 22, 2013, and she filed

this lawsuit on August 19, 2013, against her employer alleging race discrimination in violation of

Title VII.

### *Plaintiff Receives a Verbal Counseling about Failing to Comply with the Dress Code*

Plaintiff received a verbal counseling on May 16, 2013, for challenging the uniform

policy.  The write-up referenced:  (1) plaintiff's email to Ms. McKay on April 26, 2013, in which

plaintiff stated that she would not come to work until she could afford to purchase scrubs;

(2) plaintiff's failure to give advanced notice to Ms. McKay that she intended to have her order

scrubs for plaintiff; (3) plaintiff wearing accessories, belt, open jacket, and shirt under her scrubs

and high heel shoes, all of which was inappropriate under the dress code; and (4) plaintiff's

continued challenges to the prohibition of wearing high heels with scrubs.  Plaintiff asserts that

this write-up is unfounded because she disputes that she "challenged" the dress code.  Instead,

she describes her email communications with Ms. McKay and Mr. Dedecker as correspondence

about the policy change.  Plaintiff also believes that she complied with the new dress code when

it went into effect and that she only "dressed up" her scrubs by wearing other accessories and heels.  Plaintiff disagreed with the write-up, and she refused to sign it.

Plaintiff does not recall who attended the May 16, 2013 meeting, although she believes it could have been Ms. McKay, Ms. Sherman, Ms. Ray, and possibly Ms. Dye (on an intercom).  Plaintiff testified that she does not recall anything about the May 16, 2013 meeting and does not remember what anyone said during this meeting.  She does not recall if anyone said or did anything inappropriate or offensive at that meeting, and she does not remember if anyone used an inappropriate tone of voice at that meeting.  Plaintiff does recall attending a meeting at some point in May 2013, where she felt like the participants were inappropriate and disrespectful and treated her like she was an animal, although plaintiff does not recall the meeting in which this occurred.

### Plaintiff Complains about Defendant's Hire of a Part-Time Unit Secretary

Around February 2013, Ms. Sherman told plaintiff that the Hospital was watching its budget and that plaintiff could no longer work overtime.  On or before February 18, 2013, plaintiff learned that the Hospital would be hiring a part-time unit secretary to work evenings.  Plaintiff sent an email to Ms. McKay on February 18, 2013, complaining about the hiring of a part-time unit secretary because plaintiff believed there was already an employee at the Hospital who could do the work.  Plaintiff also questioned the Hospital's hiring of a part-time secretary because she thought the Hospital was watching the budget and prohibiting her from working overtime.

The Hospital hired Ms. McKay's daughter, Alyssa McKenzie, as the part-time unit secretary.  Alyssa McKenzie is African-American.  She is the daughter of Ms. McKay and Kipp

McKenzie, an African-American male.  Ms. McKay and Mr. McKenzie were in a long-term committed relationship, but they have since separated.

Plaintiff testified that her job description required her to work overtime if necessary to finish a task or address anything that came along.  Plaintiff recalled that from the beginning of her employment at the Hospital, employees would receive emails from the CEO telling them to limit overtime because the Hospital was watching the budget.  But the CEO never prohibited overtime altogether.  Instead, the CEO only requested that employees watch the amount of overtime.  Plaintiff thought the hiring of Alyssa McKenzie as a part-time unit secretary was unfair because the Hospital had told her that it was watching the budget and that she could not work overtime, but at the same time the Hospital was creating jobs.  Plaintiff also believed that the hiring of the part-time unit secretary in February 2013 was proof that the Hospital was trying to get rid of her because she had filed an EEOC charge and a lawsuit (although plaintiff did not file her EEOC charge until May 6, 2013 and her lawsuit until August 19, 2013).

On August 20, 2013, plaintiff sent an email to Ms. McKay stating she had a concern about the part-time unit secretary working after plaintiff was told that she could no longer work overtime.  Plaintiff noted in her email that she believes she is a "target" because she speaks her mind.  Ms. McKay responded to plaintiff's email by explaining that the Hospital was using the evening secretary on a trial basis because it was experiencing increased patient admissions after plaintiff's shift had ended.  She also explained that when the patient census is low, the Hospital cannot justify overtime.  Plaintiff responded to Ms. McKay's email asserting that she thought it was less expensive to pay plaintiff overtime than to pay Ms. McKenzie, as the part-time secretary, to work an evening shift.  Plaintiff stated in the email:  "Alyssa coming in everyday after 3pm will never make me believe that my overtime is more of what yaw is paying her in one

18

week less none that it will be 40 or more hours every two weeks. . . . But thanks for trying to explain to me of what yaw took away from me." Doc. 76-21 at 2. Plaintiff's hourly rate of pay from January 1, 2013, through October 12, 2013, was $14.46 per hour, making her overtime rate $21.69 per hour. Ms. McKenzie's hourly rate of pay in 2013 was $12.50 per hour.

### Plaintiff's 2013 Annual Review and Written Warning

Ms. McKay, Ms. Pfeiffer, and Ms. Sherman gave input on plaintiff's 2013 annual review (which covered the July 1, 2012 to June 30, 2013 time period). Plaintiff scored a "Level 3" ("Meets Expectations") on her overall review score in the 2013 annual review. Plaintiff received her 2013 annual review on December 9, 2013, in a meeting with Ms. McKay and Ms. Pfeiffer. She also received a written warning during the December 9, 2013 meeting for missing orders and for insubordination/communicating with her supervisors in an unprofessional manner.

Plaintiff had several concerns about her 2013 annual review and the December 9, 2013 meeting including that: (1) Ms. McKay called plaintiff disrespectful; (2) Ms. McKay's tone of voice was disrespectful; (3) after plaintiff asked why she had two managers attending the review meeting, Ms. McKay said she was at the meeting because plaintiff had allegations against the company; (4) Ms. McKay threw up her hands; (5) Ms. McKay told plaintiff she needed to figure out how to stop orders from being missed even though plaintiff had raised concerns to management about missing orders; (6) Ms. McKay "talked down to" and "beneath" plaintiff; (7) plaintiff left the meeting in tears; and (8) her annual review included negative comments. Plaintiff has no knowledge whether Ms. McKay and Ms. Pfeiffer jointly presented any other employee's annual reviews.

Plaintiff became upset when she learned about the written warning because she denies that she was missing orders. She also believes that the nurses shared the responsibility of taking

off orders; it was not solely her responsibility as a unit secretary.  Also, plaintiff disagreed with

the write-up because she had never had a problem with missing orders when there was the 5:00

chart check.  But Mr. Dedecker testified that he considers the 5:00 chart check as a "last ditch"

attempt to confirm that staff has not missed any orders.  However, Mr. Dedecker is not aware of

the training plaintiff received about the 5:00 chart check or its primary purpose, and he is

uncertain whether the Hospital has a written policy about 5:00 chart checks for the unit

secretaries.

The written warning included documentation of plaintiff's missed orders.  Plaintiff

testified that the documentation was not the correct way to approach someone to advise that she

was missing orders.  Also, plaintiff testified that she disagreed with the part of the written

warning for insubordination/unprofessional communications because she believes she should be

able to voice her opinion without anyone providing negative feedback or accusing her of

insubordination.

Plaintiff also takes issue with her 2013 annual review because Human Resources

Manager Holly Ray did not sign it as she had in past years, and plaintiff believes she received the

review at a date later than she was supposed to receive it.  Plaintiff refused to sign her 2013

annual review because she believed someone had altered it.  She also refused to sign it because

Holly Ray had not signed it, as she had in the previous years.  Plaintiff also refused to sign the

December 9, 2013 written warning.

### *Plaintiff's Termination*

Plaintiff asked Mr. Dedecker to investigate the December 9, 2013 written warning

because plaintiff wanted him to overturn it.  Mr. Dedecker investigated the December 9, 2013

written warning by:  (1) reviewing the written warning and supporting documentation;

(2) reviewing plaintiff's annual performance appraisals to determine whether missing orders was something that had previously been raised with plaintiff; and (3) discussing the issue with Ms. McKay and Ms. Pfeiffer to determine whether they had previously spoken with plaintiff about missing orders. Mr. Dedecker concluded that the written warning was warranted because he believed plaintiff had missed orders and not performed her job in the way she should.

On January 10, 2014, Mr. Dedecker met with plaintiff to discuss his findings from his investigation. Mr. Dedecker had no intention of terminating plaintiff's employment at that meeting. Mr. Dedecker hoped that his discussion with plaintiff would help her understand the errors she had made and would encourage her to work to correct them going forward. When Mr. Dedecker met with plaintiff, he advised her that the December 9, 2013 written warning was going to stand. In response, plaintiff said: "How do you feel like the write-up is going to stand because I know my job duties?" Doc. 76-1 at 323–24 (Winn Dep. 322:21–23). Plaintiff explained to Mr. Dedecker what her job duties were and that she was never told that she was making errors. Mr. Dedecker told plaintiff that, to the contrary, he understood that she had received counseling in the past about missing orders. Plaintiff again insisted that no one had told her that she was making errors with the orders.

Plaintiff testified that Mr. Dedecker then began to "get loud" with her, telling plaintiff that her errors were putting patients at risk. Plaintiff tried to explain her side of the story and objected that she could not put patients at risk unless it involved a stat order. Plaintiff told Mr. Dedecker that she knew her job duties, and she knew that if she missed orders they would be caught at the 5:00 chart check. Plaintiff admits that she raised her voice in the meeting, but she contends that she did not raise her voice like Mr. Dedecker did. Mr. Dedecker became upset in the meeting. He pointed his fingers and hit the table. He also told plaintiff that she would be

fired if she missed another order.  Plaintiff told Mr. Dedecker that he needed to stop raising his voice.

Mr. Dedecker then left the room and asked for Human Resources Director Cathy Loudon to join the meeting.  According to plaintiff, Mr. Dedecker became more upset when Ms. Loudon joined the meeting and he repeatedly told plaintiff that he will fire her if she missed another order.  Plaintiff again told Mr. Dedecker:  "Troy, I'm not missing orders.  I said I've been doing my job for five years, so basically I've been doing my job wrong for the last five years, is what I told him."  Doc. 76-1 at 327–28 (Winn Dep. 326:23–327:2).  Plaintiff told Ms. Loudon that she was not going to let Mr. Dedecker to continue to yell at her and that she was not a kid.  Mr. Dedecker then told plaintiff and Ms. Loudon to "get out" of the room, thereby ending the meeting.

Plaintiff had no concerns or problems with Mr. Dedecker before the January 10, 2014 meeting.  Plaintiff testified that Mr. Dedecker's behavior at the January 10, 2014 meeting was an act of insubordination, and was disrespectful and intimidating.  After the meeting, Mr. Dedecker sat in his office and thought about what had transpired.  Mr. Dedecker observed that plaintiff, during the entire meeting, was convinced that she had not done anything wrong despite earlier counseling.  Mr. Dedecker concluded that the issue was beyond a need for training, and instead he determined that plaintiff was incapable of following orders and was causing an immediate risk to patients.  Mr. Dedecker believed that plaintiff lacked the insight to understand that she was not performing her job, and he was concerned that she thought missing orders was inconsequential if the 5:00 chart check would catch them.

Within 15 minutes after the meeting ended, Mr. Dedecker made the decision to terminate plaintiff's employment.  Mr. Dedecker concluded that he did not have confidence in plaintiff's

abilities.  He believed plaintiff was putting patients at risk by failing to take off orders in a timely

manner, and he was concerned about plaintiff's unwillingness to admit that she had made any

mistakes.  Mr. Dedecker did not consult with the human resources manager before deciding to

terminate plaintiff's employment because he believes that he had ultimate responsibility for

patient safety, and he had concluded that plaintiff represented a significant and immediate risk to

patients.  Therefore, on January 10, 2014, defendant terminated plaintiff's employment.

### Plaintiff's Second Charge of Discrimination

After her termination, plaintiff filed a second charge of discrimination with the EEOC on

February 28, 2014, alleging race discrimination and retaliation.  Plaintiff stated in her charge that

she had filed a lawsuit on August 19, 2013, and that her employment was terminated on February

10, 2014, as retaliation for filing the lawsuit.  Plaintiff also alleged in her charge that her direct

supervisors made negative comments to her about her pending lawsuit and that her coworkers

were made aware of the lawsuit.  Plaintiff did not check the continuing violation box on her

February 28, 2014 charge of discrimination.

### Plaintiff's Allegations of Race Discrimination

Plaintiff testified that she thought Ms. McKay, Ms. Sherman, and Ms. Ray treated her

unfairly because of her race because a white (and pregnant) Staffing Coordinator was allowed to

wear brown in her scrub top that plaintiff believed to violate the dress code.  Plaintiff sent an

email to Ms. Dye on May 16, 2013, asking why she was counseled about the dress code when

the Staffing Coordinator was wearing a scrub top that plaintiff believed to violate the dress code.

The Staffing Coordinator is not required to wear scrubs, but she has elected to wear them as long

as Ms. McKay has been employed at the Hospital.

Plaintiff also testified that she thought Ms. McKay, Ms. Sherman, and Ms. Ray treated her unfairly because of her race because she "felt like" they treated Ms. Menchue better than plaintiff, giving Ms. Menchue higher scores on her annual review although Ms. Menchue had missed work because of surgery and plaintiff believed she had gone above and beyond, covering for Ms. Menchue while she was absent from work.  Plaintiff also believes she was treated unfairly because other people would ask plaintiff questions but then clarify whether plaintiff's answer was correct with Ms. Menchue.  Plaintiff testified that she thought Ms. McKay, Ms. Sherman, and Ms. Ray treated her unfairly because of her race because she believes managers would ask Ms. Menchue first if she wanted to leave for the day if the census was low.  But plaintiff also believes she was treated unfairly because she was told that she could not work overtime, and no one told Ms. Menchue that she could not work overtime.  Plaintiff also believes that Ms. McKay, Ms. Sherman, and Ms. Ray treated her unfairly because of her race because Ms. Sherman and Ms. McKay ignored her while reaching out to Ms. Menchue.  She also claims that management treated Ms. Menchue with respect but did not treat plaintiff with respect.  Plaintiff contends that they gave awards to Ms. Menchue instead of plaintiff.

Plaintiff also believes that she was singled out for dress code violations while other employees were not.  She testified that Ms. Sherman wore sleeveless tops in violation of the dress code until plaintiff reported the violation.  Plaintiff also complains that she was required to remove a piercing but a tech was allowed to put tape over a piercing.  Plaintiff believes she was treated unfairly because of her race because the Hospital changed the dress code in July 2013 to allow sleeveless tops and to prohibit high heels with scrubs.

Plaintiff also testified that Ms. McKay denied her leave to visit her father in the ICU, but she could not recall when this occurred.  Plaintiff said that Ms. McKay told her that if she left

24

work to visit her father, it would count against her attendance record.  But plaintiff had a different understanding of the attendance policy, and she believed, under her reading of the policy, that she could request an approved absence.  Ms. McKay denied plaintiff an approved absence to visit her father.

Plaintiff believes that defendant retaliated against her every time she filed something in her lawsuit against her employer.  But plaintiff admits that she did not have any reason to believe that anyone at the Hospital knew when she filed anything in her lawsuit.  Plaintiff also testified that she tried to keep her lawsuit private and that she did not share with anyone when filings were due to the Court or when she made filings with the Court.

Plaintiff thinks that Ms. Ray is not truthful and that she did not take some of plaintiff's concerns seriously.  Plaintiff testified that Ms. Ray harassed her by asking about her lawsuit and her medical leave.  But plaintiff does not recall when Ms. Ray asked about her lawsuit, and she could not recall the context of why Ms. Ray asked about the lawsuit, but she believes this occurred during a meeting with Ms. Ray and Ms. Sherman.  Plaintiff says she declined to discuss her lawsuit or medical leave with Ms. Ray.  Plaintiff worked with Ms. Ray on her medical leave issues, and plaintiff admits that she received all the leave she requested.

Plaintiff believes that Ms. Pfeiffer was watching her every move after plaintiff filed her lawsuit.  Plaintiff testified she believed Ms. Pfeiffer was watching her because most of plaintiff's allegations were against Ms. McKay, who was "best friends" with Ms. Pfeiffer.  Plaintiff believes that Ms. Pfeiffer sent other people to tell plaintiff things Ms. Pfeiffer wanted plaintiff to know instead of telling plaintiff herself.  Plaintiff believed Ms. Pfeiffer "had to have" Ms. McKay present at plaintiff's annual review meeting.

25

Plaintiff believes that Ms. Sherman watched her and followed her, trying to make it seem as if plaintiff was not doing her job.  Ms. Sherman would complain about the nurses' station where plaintiff worked in front of other nurses.  Plaintiff asserts that Ms. Sherman would "talk down" to her, but also that Ms. Sherman would not talk to her at all some of the time.  Plaintiff believes that Ms. Sherman unfairly singled her out and publically yelled at her on one occasion. Ms. Sherman approached plaintiff while she was in the process of making appointments for patients, and Ms. Sherman asked plaintiff why she had not called the family members to tell them about the appointment.  Plaintiff tried to explain that it was not the custom to call the family members about appointments, but Ms. Sherman yelled at plaintiff.  Two case managers who were standing nearby told Ms. Sherman that they agreed with plaintiff that staff do not call family members about appointments.  This led Ms. Sherman to realize that plaintiff was correct, and she stopped yelling at her.

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co*., 619 F.3d 1243, 1245–46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.*

(quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

**III.    Analysis**

Plaintiff asserts that defendant violated Title VII, 42 U.S.C. § 2000e *et seq.*, in three ways:  (1) by subjecting plaintiff to a hostile work environment based on her race; (2) by

retaliating against plaintiff after she complained about discrimination; and (3) by terminating plaintiff's employment in retaliation for complaining about discrimination.  Defendant moves for summary judgment against each one of plaintiff's three claims under Title VII.  The Court addresses each claim, in turn, below.

### A.  Racially Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e–2(a)(1).  The statute's reference to "terms, conditions, or privileges of employment" is not limited to economic or tangible discrimination—it also includes a prohibition against requiring employees to work in a discriminatorily hostile or abusive environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  An employer thus violates Title VII by maintaining a workplace "'permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* (quoting *Meritor*, 477 U.S. at 65, 67).

Plaintiff here claims that she was subjected to a racially hostile work environment during her employment with defendant.  She alleges that her work environment deteriorated after she received her annual review in October 2012.  She claims her managers unfairly criticized her performance and talked to her in a disrespectful and demeaning way.  She also alleges that she was treated differently under the dress code compared to other, non-African American employees and that she was denied privileges such as leaving work early or working overtime.  She also claims that her managers treated her differently than they did the other full-time

secretary who is Caucasian.  And plaintiff asserts that the CEO yelled at her during their meeting

on January 10, 2014, threatening her and intimidating her with his gestures.  Plaintiff claims that

these incidents, taken together, subjected her to a racially hostile work environment.

To survive summary judgment on a hostile work environment claim, a plaintiff must

show "under the totality of the circumstances (1) the harassment was pervasive or severe enough

to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or

stemmed from racial animus."  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citing

*Meritor*, 477 U.S. at 67).  Defendant argues that it is entitled to summary judgment because

plaintiff cannot demonstrate either that:  (1) the alleged harassment was based on plaintiff's race,

or (2) the alleged harassment was sufficiently pervasive or severe to constitute a hostile work

environment.  The Court agrees with defendant on both counts as explained below.

> **1.  Plaintiff Fails to Show that the Alleged Acts of Hostile Treatment Were Based on Race.**

A hostile work environment claim cannot survive summary judgment unless the facts

support an inference that "the harassment was racial or stemmed from a racial animus."  *Bolden*,

43 F.3d at 551 (citing *Meritor*, 477 U.S. at 67).  General harassment is not actionable—the

harassment must be based on race.  *Id.*  Also, the plaintiff must show "'more than a few isolated

incidents of racial enmity'" or "sporadic racial slurs."  *Id.* (quoting *Hicks v. Gates Rubber Co.*,

833 F.2d 1406, 1412 (10th Cir. 1987) (further quotation omitted)).  Instead, a plaintiff must show

"a steady barrage of opprobrious racial comments."  *Id.* (citing *Hicks*, 833 F.2d at 1412–13

(further citations omitted)).

In this case, plaintiff concedes that she has no evidence of any racial comments or slurs to

support a hostile work environment claim.  But she claims that a jury could infer that the alleged

harassment resulted from her race because defendant treated her differently than it treated other,

non-African-American employees.  First, she contends that Ms. McKay's directive to plaintiff that she could not wear high heels with her scrubs demonstrates a racial animus.  But plaintiff has adduced no admissible evidence that Ms. McKay allowed other employees to wear heels with their scrubs.  To the contrary, plaintiff admits that she was the only employee who wore heels with scrubs.  And Ms. McKay testified that she had never seen anyone wear heels with scrubs during her entire career as a nurse.  The summary judgment facts simply provide no support for an inference of racial animus when plaintiff was the only employee who wore heels with her scrubs.

Second, plaintiff contends that she was "under the impression" that management thought she could not do her job because she is African-American.  But plaintiff fails to support this claim with admissible evidence of any kind.  Instead, she claims that this was her "impression" or her "feeling."  These allegations are speculative and insufficient to create an issue of fact to avoid summary judgment.  *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (stating "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." (citation omitted)).

Third, plaintiff claims that defendant "singled" her out for dress code violations and by amending the dress code policy to prohibit high heels specifically.  Plaintiff complains that her supervisor, Ms. Sherman, wore sleeveless tops until plaintiff pointed out that it violated the dress code.  But plaintiff and her supervisor are not similarly situated, and no evidence exists showing that plaintiff was disciplined for wearing sleeveless tops.  Plaintiff also claims that the staffing coordinator (who is not a unit secretary and not required to wear scrubs to work) wore a scrub top during her pregnancy that was brown instead of the required khaki and that case managers wore heels to work.  But these employees also are not similarly situated to plaintiff—employees

30

holding these jobs were not required to wear scrubs to work.  Plaintiff further alleges that defendant treated "other white employees" differently under the dress code policy without identifying them.  The summary judgment facts show that the other similarly situated employee—Ms. Menchue—received similar treatment under the dress code policy.  Ms. Menchue wore a long sleeve t-shirt to work once, and Ms. McKay counseled her that the t-shirt did not comply with the Hospital's dress code.  Afterwards, Ms. Menchue followed the dress code policy.  No evidence exists showing that Ms. Menchue, or any other employee, wore heels with her scrub uniform and did not receive discipline, as plaintiff did.  These facts, even when viewed in the light most favorable to plaintiff, fail to support an inference that defendant's application of its dress code to plaintiff was based on her race.

Fourth, plaintiff argues that a jury could infer a racial animus from defendant's treatment of plaintiff compared to the other unit secretary, Stacey Menchue, who is Caucasian.  Plaintiff makes vague allegations such as management treated Ms. Menchue with respect, acknowledged her work, and reached out to her while ignoring plaintiff.  But again, plaintiff testified that while she "felt like" management treated Ms. Menchue better than plaintiff, she can identify no examples when defendant's treatment of Ms. Menchue differed because of race.

Instead, the examples that plaintiff cites cannot support an inference of racial harassment.  She claims that Ms. Menchue "always" received higher scores on her annual review than plaintiff did.  But this includes the reviews that Ms. Menchue received before the Hospital hired the new managers, who plaintiff claims treated her unfairly based on her race.  Plaintiff also complains that Ms. Menchue received a higher score on a review even though she was out of work for a medical issue and plaintiff covered her work during that time.  The law prohibits defendant from punishing an employee for taking medical leave, and the failure to criticize Ms.

31

Menchue for taking leave in her evaluation does not show a racial bias.  *See*, *e.g.*, 29 U.S.C. §

2615(a) (the Family Medical Leave Act prohibits employers from interfering with an

individual's right to take leave under the Act or discriminating against an individual who

opposes any practice made unlawful by the Act); *see also* 42 U.S.C. § 12112(a) (the Americans

with Disabilities Acts prohibits employers from discriminating against individuals because of a

disability).

In sum, plaintiff's complaints about defendant's evaluation of Ms. Menchue's work

compared to her work are based solely on plaintiff's belief that she performed her job better than

Ms. Menchue.  The summary judgment facts fail provide any evidentiary basis for this belief.

Instead, the evidence shows that plaintiff's evaluation in 2011 (before new management arrived

at the Hospital in 2012) addressed her failure to take off orders in a timely and accurate manner.

After the Hospital hired new management, those managers continued to address this concern

with plaintiff in later evaluations.  Although plaintiff denies that she was missing orders, the

evidence shows that management consistently addressed this aspect of plaintiff's performance

with her in a good-faith attempt to correct her errors.  *See Turner v. Pub. Serv. Co. of Colo.*, 563

F.3d 1136, 1144 (10th Cir. 2009) (explaining that the court cannot second-guess an employer's

good-faith business judgments); *see also Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452

F.3d 1193, 1203 (10th Cir. 2006) (stating that "Title VII charges neither this Court nor the jury to

act as a super personnel department that second guesses employers' business judgments"

(citation and internal quotation marks omitted)).  The comparison of Ms. Menchue's evaluations

to plaintiff's evaluations fails to provide any basis for an inference that defendant's conduct was

based on plaintiff's race.

Plaintiff also makes seemingly contradictory complaints about defendant's scheduling of Ms. Menchue's work hours. She alleges that managers would ask Ms. Menchue first if she would like to leave for the day if the census was low. But she also complains that management did not tell Ms. Menchue that she was prohibited from working overtime. Plaintiff's inconsistent complaints fail to provide any basis for an assertion that defendant allowed Ms. Menchue to work more or less than plaintiff did, and, even if it did, plaintiff provides no evidence to infer that such actions could amount to racial harassment.

Finally, plaintiff relies on statements made by two former employees of the Hospital who claim that: (a) African-American employees failed to receive the same recognition and awards for their work as Caucasian employees; and (b) African-American employees' requests for time off or schedule changes were denied but Caucasian employees' requests for the same were granted. Plaintiff argues that the Court should consider this evidence because the Tenth Circuit has relied on evidence of a harasser's conduct toward other employees to demonstrate a discriminatory intent. *See Jessen v. Babbitt*, No. 98-8069, 1999 WL 1246915, at *4 (10th Cir. Dec. 23, 1999).[1]

But, in *Jessen*, plaintiff presented evidence of an employee's harassment of other women to demonstrate his harassment of plaintiff was based on her sex. *See id.* at *3. *Jessen* cited specific examples of the harasser calling another female employee various sexist slurs. *Id.* (citing specific examples). *Jessen* also noted that the harasser acted in intimidating and sexually offensive ways such a pushing up against a female employee's body, groping her, and blocking her path. *Id.* In contrast, plaintiff here presents no evidence that other employees experienced

---

[1] Plaintiff represents that *Jessen v. Babbitt* is a published opinion. It is not. *See Jessen*, 1999 WL 1246915, at *1 n.* (stating in the caption that it is not a published decision and in the starred footnote that it is not binding precedent).

harassment from Ms. McKay, Ms. Sherman, Mr. Dedecker, or any other member of management because of their race.  Instead, the evidence plaintiff presents consists of generalized grievances from two former employees who "believed" that the Hospital treated African-Americans differently and hearsay statements that these employees "heard" that the Hospital denied African-Americans' requests for time off and schedule changes.  Plaintiff cannot avoid summary judgment by presenting this speculative and inadmissible hearsay evidence.

None of the evidence plaintiff cites can demonstrate that defendant's alleged harassment of plaintiff was based on her race.  Therefore, the Court must grant summary judgment in favor of defendant because plaintiff fails to meet one of the two requirements to support a hostile work environment claim.  But, as shown below, plaintiff's hostile work environment claim fails for a second, independent reason—plaintiff cannot establish that defendant's alleged conduct was severe and pervasive such that it constituted a hostile work environment.

## 2.  Plaintiff Fails to Show that the Alleged Conduct Was Sufficiently Severe and Pervasive to Constitute a Hostile Work Environment.

Even if the Court could conclude that any harassment was based on plaintiff's race, plaintiff also must show that the conduct was "'sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  The Tenth Circuit has explained that "'[p]ervasiveness and severity are independent and equal grounds' upon which a plaintiff may establish this element of a hostile work environment claim."  *Id.* (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)).  But, pervasiveness and severity "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also

34

violates the statute.'" *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

Determining whether the workplace is an objectively hostile work environment is not "a mathematically precise test." *Harris*, 510 U.S. at 22. The Court must examine the totality of the circumstances, including admissible evidence about "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. But, when judging hostility, the Court must ensure that it does not turn Title VII into a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[C]onduct that is merely offensive" does not violate Title VII. *Harris*, 510 U.S. at 21. For example, "'mere utterance of an . . . epithet which engenders offensive feelings in a employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* (quoting *Meritor*, 477 U.S. at 67). Instead, Title VII only prohibits conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive . . . ." *Id.*

After viewing the totality of the circumstances in the light most favorable to plaintiff, the Court concludes that no reasonable jury could find that the conduct identify by plaintiff here is sufficiently severe or pervasive enough to constitute an actionable hostile work environment claim. As discussed already, plaintiff offers no evidence of an overtly racial comment or remark that might constitute severe or pervasive harassment. *See Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (concluding that plaintiff failed to demonstrate severe or pervasive harassment when his "list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims"); *Richardson v. Blue Cross/Blue*

*Shield of Kan., Inc.*, 196 F. Supp. 2d 1174, 1185 (D. Kan. 2002) (granting summary judgment against plaintiff's hostile work environment claim where she alleged "no racially derogatory comments or even isolated racial acts, and thus ha[d] no independent factual foundation for th[e] claim."). Indeed, the Tenth Circuit has upheld summary judgment in cases where plaintiffs were subjected to at least some racial slurs but no hostile work environment existed because the racial remarks were isolated or rare instances. *See*, *e.g.*, *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (upholding summary judgment against hostile work environment claim because two racially offensive remarks fall far short of the "steady barrage" required to support a claim); *Bolden*, 43 F.3d at 551–52 (concluding that two overly racial remarks did not amount to a "a steady barrage of opprobrious racial comment as required to show a racially hostile work environment" (citation and internal quotation marks omitted)). Here, plaintiff has even less. She does not even claim a single racial comment—presenting no evidence of any racial slurs or acts in the workplace that could demonstrate severe or pervasive harassment.

Instead, plaintiff relies on neutral conduct that, she claims, constitutes severe and pervasive harassment. She asserts that this harassment began on October 19, 2012, when she received her annual review. She alleges that her two managers unfairly picked apart her job performance, degraded her job, spoke negatively to her, and made her feel like one of the worst employees. Plaintiff alleges that her review in 2013 was no different. She claims that her review was full of negativity even though she was doing her job correctly, and she contends that she unfairly received a write-up. She also claims that her managers never gave her awards. Plaintiff characterizes defendant's criticisms of her work as harassment but, even when viewing the evidence in the light most favorable to plaintiff, it shows only that plaintiff disagrees with her managers' evaluation of work. Indeed, plaintiff received counseling about the same performance

issues before the Hospital hired new management who evaluated plaintiff's job performance and eventually terminated her employment, and the Court's role here does not extend to second-guessing her employer's good-faith business judgments about her performance.  *See Turner*, 563 F.3d at 1144; *Argo*, 452 F.3d at 1203.  In addition, plaintiff complains about two annual reviews that she received about a year apart.  But this timing negates the possibility of the requisite pervasiveness.  And the substance discussed in those meetings focused on plaintiff's job performance and improving that performance.  Even if that discussion included negative comments, it falls far short of severe, illegal harassment.

Trying to muster severe or pervasive harassment, plaintiff next relies on her communications with defendant about the dress code.  In most of these instances, though, plaintiff was the person who initiated the communications about the dress code—not her employer.  And, in many of the communications, she simply objected to the Hospital's decision to change a policy that applied to all employees in a larger cohort, telling Ms. McKay that she was not happy about it and telling Mr. Dedecker that the "one thing" he needed to understand is to value his employees.  Defendant's communications with plaintiff addressed her disagreement with the new dress code policy and informed her of her need to comply with it.  None of these communications demonstrate severe or pervasive harassment.  Also, as explained above, none of the summary judgment facts can demonstrate that the Hospital applied the dress code differently to plaintiff than other, similarly-situated employees.  No other evidence exists showing that defendant's application of the dress code policy to plaintiff amounted to severe or pervasive harassment.

Plaintiff also complains that her managers ignored her and would send others to speak to her instead of talking to her directly.  But she also complains that she was called into a lot of

meetings with management and that her managers scrutinized her every move.  In any event, the alleged passive treatment of plaintiff does not constitute severe or pervasive harassment.  *See MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (affirming summary judgment and holding that a supervisor's passive treatment of plaintiff did not amount to actionable harassment).

Plaintiff also asserts that her managers kept her from working overtime.  She also complains that she was denied a request to leave work early.  But plaintiff provides no evidence that could demonstrate that defendant treated other, similarly situated employees differently than it treated plaintiff's requests to work overtime or leave early.  Without such evidence, plaintiff fails to show that defendant's conduct toward plaintiff on these subjects amounted to harassment.

Finally, plaintiff alleges that she was subjected to severe and pervasive harassment during her meeting with Mr. Dedecker in January 2014.  Mr. Dedecker raised his voice in this meeting, pointed at plaintiff, hit his hand on the table, and threatened to fire plaintiff if she missed another order.  Mr. Dedecker's actions in the meeting, when viewed in the light most favorable to plaintiff, may have been "boorish, juvenile, or annoying," but his conduct does not amount to a hostile work environment.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (citing *Faragher*, 524 U.S. at 778).  When taken in the light most favorable to plaintiff, one can view Mr. Dedecker's behavior as rude or impolite, but the conduct falls short of the severity required to support a hostile work environment claim.  It also fails to demonstrate pervasive harassment because plaintiff describes only this one incident of boorish behavior.  Indeed, plaintiff testified that she had no concerns or problems with Mr. Dedecker before the January 10, 2014 meeting.

When viewing all of defendant's conduct as a whole in the light most favorable to plaintiff, her complaints fail to demonstrate the objective severity or pervasiveness required to present a submissible claim for hostile work environment.  In reaching this conclusion, the Court recognizes that the Tenth Circuit has described the severity and pervasiveness evaluation as "particularly unsuited for summary judgment because it is quintessentially a question of fact." *Tademy*, 614 F.3d at 1144 (citation and internal quotation marks omitted).  Nevertheless, the Tenth Circuit has affirmed summary judgment decisions against hostile work environment claims that fail to demonstrate sufficiently severe or pervasive conduct.  *See, e.g., Villamar v. Lincare, Inc.*, __ Fed. App'x __, 2015 WL 5024902, at *2 (10th Cir. Aug. 26, 2015) (holding that the district court "properly granted summary judgment" against plaintiff's hostile work environment claim because three comments that could be interpreted as referring to plaintiff's race, coupled with racially neutral conduct, was not so severe or pervasive to create a hostile work environment); *Al-Kazaz v. Unitherm Food Sys., Inc.*, 594 Fed. App'x 460, 462–63 (10th Cir. 2014) (affirming summary judgment because three improper comments made to plaintiff were discrete, isolated, unrelated, and made by different co-workers and did not amount to severe or pervasive conduct to support a hostile work environment claim); *Bolden*, 43 F.3d at 551–52 (affirming summary judgment because only two overtly racial remarks and one arguably racial comment over an eight year period, even when coupled with general ridicule that was not overtly racial, was not pervasive enough to support a hostile work environment claim); *see also Morris*, 666 F.3d at 669 (upholding summary judgment because no reasonable jury could determine that plaintiff experienced a hostile work environment based on sex); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997) (agreeing with the district court that plaintiff failed to present sufficient evidence from which a reasonable jury could find he was subjected to

an objectively hostile work environment); *Gross v. Burggraff Constr. Co.*, 53 F.3d 1531, 1539,

1547 (10th Cir. 1995) (explaining that courts can resolve Title VII claims on summary judgment

if no genuine issues of material fact remain for trial and affirming summary judgment against

plaintiff's hostile work environment claim).  Like those cases, the facts here simply fail to

advance sufficient evidence for a reasonable jury to find that plaintiff was subjected to severe or

pervasive harassment.  Plaintiff's hostile work environment claim thus cannot survive summary

judgment.

### B.  Retaliation and Retaliatory Discharge Claims

Plaintiff's second Title VII claim asserts that defendant retaliated against her after she

complained about discrimination, and her third Title VII claim asserts that defendant terminated

her employment in retaliation for complaining about discrimination.  The *McDonnell Douglas*

burden-shifting framework applies to plaintiff's Title VII retaliation claims.  *Davis v. Unified*

*Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973)); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011).

Where no direct evidence of retaliation exists, plaintiff first must establish a prima facie case of

retaliation by showing that:  "(1) [s]he engaged in protected activity; (2) [s]he suffered an

adverse employment action; and (3) there is a causal connection between [her] protected activity

and the adverse employment action."  *Id.* (citing *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d

987, 998 (10th Cir. 2011)).  "The Supreme Court has recently clarified the causation standard for

Title VII retaliation claims, explaining: '[A] plaintiff making a retaliation claim under § 2000e–

3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse

action by the employer.'"  *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.

Ct. 2517, 2534 (2013)).

Next, if plaintiff meets this prima facie burden, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Crowe*, 649 F.3d at 1195. And, last, where defendant satisfies this burden, the burden shifts back to plaintiff to show that defendant's proffered reasons for its actions are pretextual. *Id.* (citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006)). Defendant argues that plaintiff's Title VII retaliation claims cannot survive summary judgment under the *McDonnell Douglas* test. The Court thus addresses each of plaintiff's retaliation claims below.

### 1. Retaliation Claim

In her summary judgment response, plaintiff lists a number of actions taken by defendant that, she claims, retaliated against her for filing a charge of discrimination with the EEOC and this lawsuit. The Court must sift through this list, however, to determine which alleged retaliatory acts are properly before the Court at summary judgment because plaintiff's inventory includes conduct not found in the Pretrial Order.[2]

Plaintiff asserted two bases for her retaliation claim in the Pretrial Order. She alleges that she lost overtime hours in retaliation for filing her EEOC charges of discrimination and this lawsuit. Doc. 72 at 4, 6. She also asserts that, after she filed this lawsuit, defendant's treatment of her worsened in retaliation for asserting her Title VII rights, and that her direct supervisors

---

[2]     The Pretrial Order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d); see also Doc. 72 at 1 ("This pretrial order supersedes all pleadings and controls the subsequent course of this case."). Thus, when a party fails to include an issue in the Pretrial Order, that issue is not part of the case before the court. *See Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (holding that defendants waived a statute of limitations defense even though defendants pleaded it because the Pretrial Order, which supersedes the pleadings, omitted the statute of limitations defense); *Smith v. Potter*, Case No. 05-2149-JWL, 2006 WL 3050814, at *3 n.1 (D. Kan. Oct. 25, 2006) (explaining that "to the extent plaintiff alleged discrete claims of discrimination or retaliation in his complaint, in his amended complaint or in his summary judgment papers other than those appearing in the pretrial order, those claims are waived."). Therefore, any discrete acts of retaliation that plaintiff lists in her summary judgment response that she failed to include in the Pretrial Order are not properly before the Court on summary judgment.

made negative comments to her about the pending lawsuit.  *Id.* at 5.  The Court addresses these two theories of retaliation, below.

### a.  Lost Overtime Hours

Defendant argues that plaintiff's retaliation claim for lost overtime hours fails because she cannot establish the third prong of a prima facie case of retaliation—that is, a causal connection between the filing of her charge of discrimination on May 6, 2013, and the reduction in overtime hours which occurred three months earlier in February 2013.   The Court agrees. The summary judgment facts establish that Ms. Sherman told plaintiff in February 2013, that the Hospital was watching its budget and plaintiff could no longer work overtime.   Indeed, plaintiff sent an email to Ms. McKay on February 19, 2013, complaining about the hiring of a part-time secretary because plaintiff thought the Hospital was watching the budget after she was told that she could not work overtime.  But it was not until May 6, 2013, that plaintiff filed her first charge of discrimination.  Because plaintiff's filing of the charge occurred months after defendant told plaintiff she could no longer work overtime, plaintiff cannot establish the necessary causal connection between her protected activity and the adverse employment action—the third prong of the prima facie test.

But, even if plaintiff could demonstrate a prima facie case of retaliation, defendant has satisfied its burden to provide a legitimate, non-retaliatory reason for the overtime reduction. Defendant explains that it reduced plaintiff's overtime because the Hospital was managing its budget and did not want to incur unnecessary overtime expenses.  In response to plaintiff's questioning about the hiring of a part-time secretary, Ms. McKay explained to plaintiff that the Hospital could not justify overtime when patient census was low.  Instead, the Hospital hired a part-time secretary, who it employed at an hourly rate much less than plaintiff's hourly overtime

wage.  (Plaintiff's overtime rate was $21.69 per hour while the part-time secretary earned $12.50 per hour.)  This is a legitimate, non-retaliatory reason for reducing plaintiff's overtime hours.

Plaintiff also cannot establish that defendant's proffered reason for reducing overtime hours is pretext for retaliation.  "A plaintiff may show pretext 'by demonstrating such weaknesses, implausibilities, inconsistencies, incoherenc[i]es, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.'"  *Crowe*, 649 F.3d at 1196 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).  "Pretext may also be shown by providing direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."  *Id.* (citing *Swackhammer*, 493 F.3d at 1167–68).

Here, plaintiff provides no evidence showing that defendant's proffered reason is false or unworthy of credence.  The Hospital's hiring of a part-time secretary does not establish pretext.  The summary judgment facts establish that the Hospital believed it was more efficient to employ a part-time secretary on a trial basis than to pay plaintiff overtime.  The summary judgment facts support the logic of this conclusion, for the Hospital paid the part-timer for less than it paid plaintiff.[3]  Plaintiff presents no other evidence to demonstrate pretext, and therefore her retaliation claim fails as a matter of law.

---

[3]      To the extent plaintiff complains about the hiring of Ms. McKay's daughter for this position, federal law does not make such hiring practices illegal.  Title VII does not prohibit favoritism based on criteria other than race—such as a personal acquaintance or good working relationship.  *See Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1276 (D. Kan. 2002) (citing *Housley v. Boeing Co.*, 177 F. Supp. 2d 1209, 1217 (D. Kan. 2001) (citing *Paulsboe v. Farnam Cos., Inc.*, 120 F.3d 271, 1997 WL 431414, at *2 (10th Cir. 1997) (unpublished table opinion)) (further citations omitted)).

For these reasons, the Court concludes that no reasonable jury could infer that defendant's reduction in plaintiff's overtime hours was retaliatory.  Therefore, defendant is entitled to summary judgment on this claim.

### b.  Negative Treatment and Comments about Plaintiff's Lawsuit

Plaintiff also claims that defendant's treatment of her worsened after she filed the lawsuit and that her direct supervisors made negative comments to her about the pending lawsuit.  Doc. 72 at 5.  Viewing these allegations in the light most favorable to plaintiff, they fail to constitute adverse employment actions necessary to support the second requirement of a prima facie case of retaliation.

The Supreme Court has explained that Title VII protects employees from retaliation that produces an injury or harm.  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006).   A challenged employment action is "adverse" for the purposes of a Title VII retaliation claim if "a reasonable employee would have found [it] materially adverse."  *Id.* at 68.  This means that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (citation and internal quotation marks omitted).

The determination whether an employment action is materially adverse is a "case-specific and contextually sensitive inquiry."  *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).  The Circuit has directed district court to "examine claims of adverse action through a 'case-by-case approach, examining the unique factors relevant to the situation at hand.'"  *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)).  A court must determine the materiality of a claimed adverse action under an objective standard.  *Id.* "'[P]etty slights, minor annoyances, and simple lack of good manners' will not deter 'a reasonable worker from making or supporting a charge of

44

discrimination.'" *Id.* (quoting *Burlington*, 548 U.S. at 68).  But, as the Supreme Court has noted, "[c]ontext matters."  *Burlington*, 548 U.S. at 68.

Here, plaintiff has identified two negative comments about her lawsuit.  First, she testified that she asked why two managers were in attendance during her annual review meeting on December 9, 2013, and Ms. McKay said she was attending the meeting because plaintiff had made allegations against the company.  Second, plaintiff testified that Ms. Ray harassed her by asking about her lawsuit.  Plaintiff does not recall when Ms. Ray asked about her lawsuit, or even the context of this reference.  These two comments, even when viewed in the negative light plaintiff attributes to them, are not sufficiently adverse to support a retaliation claim.  *See Sanchez*, 164 F.3d at 533 (explaining that "unnecessary derogatory comments" are not in themselves materially adverse employment actions); *see also Novak v. Nicholson*, 231 Fed. App'x 489, 495 (7th Cir. 2007) (explaining that "passing comments and caricatures were just that—trivial slights that would not deter a reasonable employee from complaining about discrimination." (citation and internal quotation marks omitted)).  Viewing the evidence in the light most favorable to plaintiff, these two comments may have constituted a petty slight or minor annoyance.  But our cases do not view them as actionable ones under Title VII.

Also, plaintiff's allegation that defendant's treatment of her worsened after she filed the lawsuit is insufficient to demonstrate a materially adverse employment action.  As explained above, even when viewing the evidence in the light most favorable to plaintiff, she fails to show that defendant's conduct created a racially hostile work environment.  The case law consistently demonstrates that a plaintiff cannot support a retaliation claim with conduct falling short of the severity or pervasiveness required for a hostile work environment claim.  *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008) (affirming summary judgment against a retaliation

claim based on hostile work environment because "the conduct described is not indicative of the pervasively hostile work environment necessary to survive the objective test of the second prong of the prima facie [retaliation] standard."); *see also McGowan*, 472 F.3d at 743–44 (upholding summary judgment against a retaliation claim because the record did not contain facts showing a hostile work environment sufficient to constitute a materially adverse action under Title VII because many of the complaints were "of a trivial nature and do not rise to a claim of an 'abusive' materially adverse work environment."); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (affirming summary judgment against retaliation claim and explaining that "[g]eneral hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive.").

In sum, plaintiff's allegations about negative treatment and comments about her lawsuit do not constitute materially adverse actions necessary to support a retaliation claim. Thus, summary judgment is warranted on this retaliation claim as well.

## 2. Retaliatory Termination

Last, plaintiff asserts a retaliatory termination claim. She alleges that defendant terminated her employment as retaliation for filing a charge of discrimination and this lawsuit. Defendant argues that it is entitled for summary judgment against this claim because plaintiff cannot establish a causal connection between her protected activity and the termination decision necessary for a prima facie case of retaliation. Second, defendant argues that even if plaintiff could make this showing, plaintiff cannot demonstrate that defendant's legitimate, non-retaliatory reason for terminating plaintiff's employment was pretext. The Court addresses each argument below.

### a.  Causal Connection

Defendant argues that plaintiff cannot establish a causal connection between her protected activity and her discharge.  The Tenth Circuit has explained that "[t]he 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'"  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)).  The temporal proximity between plaintiff's protected activity and her termination may demonstrate "a causal connection sufficient to 'justify an inference of retaliatory motive.'"  *Id.* (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).  But temporal proximity alone does not establish the necessary causal connection unless "'the termination is *very closely* connected in time to the protected activity.'"  *Id.* (quoting *Anderson v. Coors Brewing* Co., 181 F.3d 1171, 1179 (10th Cir. 1999)).  The Tenth Circuit has determined that a period of six weeks between the protected activity and termination may, by itself, establish a causal connection, but a period of three months does not.  *Anderson*, 181 F.3d at 1179.

Here, plaintiff engaged in protected activity not closely connected in time to her termination.  Plaintiff filed her charge of discrimination on May 6, 2013, and her lawsuit on August 19, 2013.  The summary judgment facts establish that Mr. Dedecker (the person who made the decision to discharge plaintiff) learned of plaintiff's charge of discrimination on May 24, 2013, some seven months before he terminated her employment on January 10, 2014.  Plaintiff's termination also occurred over four months after she filed her lawsuit.  The temporal proximity between the protected activity and plaintiff's discharge is insufficient to establish the causal connection for purposes of a prima facie case of retaliation.  *See*, *e.g.*, *Meiners v. Univ. of*

*Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (affirming summary judgment and concluding that

plaintiff failed to establish a causal connection where adverse action came at least two months

and one week after protected activity)*; Hysten v. Burlington N. and Santa Fe Ry. Co.*, 296 F.3d

1177, 1183 (10th Cir. 2002) (affirming summary judgment and holding that three months

between filing of race discrimination complaint and a written reprimand was insufficient,

standing alone, to establish causal connection); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390,

1395 (10th Cir. 1997) (explaining that "the four month time lag between [plaintiff's]

participation in protected activity and his termination by itself would not be sufficient to justify

an inference of causation."). Thus, plaintiff must produce additional evidence to show a

submissible basis for causation.

Plaintiff asserts that she has provided additional evidence in two ways. First, she

contends that a jury could infer a causal connection because she filed documents with the Court

in her lawsuit on the day before her termination. But plaintiff testified that she did not have any

reason to believe that anyone at the Hospital knew about it when she filed anything in her

lawsuit. She also testified that she tried to keep her lawsuit private and that she did not share

with anyone when filings were due to the Court, or when she had made filings with the Court.

Viewing the evidence in the light most favorable to plaintiff, the summary judgment facts fail to

demonstrate that Mr. Dedecker knew about the filings in plaintiff's lawsuit when he made the

decision to terminate plaintiff on January 10, 2014. Without such evidence, plaintiff fails to

establish a causal connection. *See Hysten*, 296 F.3d at 1184 (explaining that "the proximity

between a specific litigation activity and the alleged retaliatory act is meaningless unless those

who caused the alleged retaliatory act to occur are shown to have been aware of the specific

activity." (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)).

Second, plaintiff asserts that the number of emails and meetings addressing her concerns about a hostile work environment between the filing of her lawsuit and her termination create the necessary causal connection. She cites no case law as authority that can support this argument, and she fails to explain how these communications could establish a causal connection between her protected activity and termination—other than referencing the arguments made in support of her hostile work environment claim. As previously noted, plaintiff initiated many of these communications with her employer, so they cannot demonstrate a causal connection. Also, the Court already has determined that plaintiff's allegations fail to demonstrate an actionable hostile work environment claim. *See supra* Part III.A. Those same allegations also fail to demonstrate a causal connection between plaintiff's protected activity and termination.

### b. Pretext

Even if plaintiff could establish a causal connection to support a prima facie case of retaliation, defendant argues that plaintiff's retaliation claim fails because she presents no evidence of pretext. Under the second step of the *McDonnell Douglas* test, defendant has satisfied its burden of producing a legitimate, non-retaliatory reason for plaintiff's termination. That is, Mr. Dedecker made the decision to terminate plaintiff's employment after their January 10, 2014 meeting because he believed plaintiff was putting patients at risk by failing to take off orders in a timely manner, and he was concerned about plaintiff's unwillingness to admit that she had made mistakes. Mr. Dedecker testified that he had no intention of terminating plaintiff's employment going into the meeting. But, during that meeting, he observed that plaintiff was convinced that she had not done anything wrong despite earlier counseling, and he concluded that plaintiff lacked the insight to understand that she was failing to perform her job. Thus, Mr. Dedecker's reason for terminating plaintiff's employment is a legitimate, non-retaliatory reason.

Having satisfied defendant's burden, the *McDonnell Douglas* test now shifts the burden back to plaintiff to demonstrate that defendant's proffered reason for the termination is pretextual.  Plaintiff argues that she has established pretext in three ways:  (1) defendant's reason for the termination is false; (2) plaintiff's protected activity and her termination is in close temporal proximity; and (3) defendant treated plaintiff differently than the other, Caucasian full-time secretary, Stacey Menchue.  Viewing the evidence in the light most favorable to plaintiff, none of these demonstrates a triable issue about pretext.

First, plaintiff fails to show that defendant's reason for the termination is false.  While plaintiff claims that she was performing her job correctly and not missing orders, she uses her own personal opinions and speculation to support these facts.  Such evidence is insufficient to establish pretext.  *See Bones*, 366 F.3d at 875 (explaining that a plaintiff cannot defeat summary judgment with evidence that is "mere speculation, conjecture, or surmise.") (citation omitted)).  Also, the summary judgment facts show that plaintiff received counseling in her annual review about taking orders accurately and timely even before new management was hired at the Hospital and began criticizing plaintiff's performance in that area.  The evidence, when viewed in the light most favorable to plaintiff, shows that defendant held concerns about plaintiff missing orders.  The Court will not second-guess defendant's good-faith business judgments.  *See Turner*, 563 F.3d at 1144; *Argo*, 452 F.3d at 1203.  Plaintiff's claim that defendant's reason for terminating her employment is false fails to show pretext.

Second, plaintiff alleges that the temporal proximity between her protected activity and her termination demonstrates pretext.  The Tenth Circuit has explained that temporal proximity is one factor to consider when determining whether the employer's proffered reason is pretext for retaliation, but a plaintiff cannot rely on "very close temporal proximity" alone to establish

pretext.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (stating that "[a]llowing very close temporal proximity to operate as a proxy for [the pretext] evidentiary requirement would not further the substantive purposes of our inquiry at this stage." (internal quotation marks omitted)); *see also Medina v. Income Support Div.*, 413 F.3d 1131, 1138 (10th Cir. 2005) ("[Temporal proximity] is not alone sufficient to defeat summary judgment." (citation and internal quotation marks omitted)).  For the reasons discussed above, plaintiff fails even to demonstrate a "very close temporal proximity" between the filing of her protected activity and her termination.  This evidence, without more, does not establish a triable issue over pretext.

Last, plaintiff asserts that she can establish pretext because defendant treated her differently than Ms. Menchue.  But, as addressed above in the context of plaintiff's hostile work environment claim, plaintiff's allegations comparing her treatment to Ms. Menchue's are premised on plaintiff's personal beliefs and speculation that she was performing at the same level as Ms. Menchue.  The summary judgment facts show, however, that Ms. Menchue always received higher performance ratings than plaintiff, even before the new management came to the Hospital in 2012.  Also, the summary judgment record lacks any evidence to show that Ms. Menchue was missing orders or that her performance was deficient in areas that put patients at risk, like plaintiff.  The summary judgment facts also lack any evidence that Ms. Menchue engaged in behavior similar to plaintiff's behavior during her meeting with Mr. Dedecker on January 10, 2014.  Plaintiff presents no evidence showing that Ms. Menchue was unwilling to admit that she had made any mistakes or lacked the insight to understand that she was failing to perform her job, but defendant did not fire her.  Thus, defendant's treatment of Ms. Menchue does not present a basis for a triable issue of pretext.

For all these reasons, plaintiff fails to demonstrate that Mr. Dedecker's reason for terminating plaintiff's employment was pretext for retaliation.  Thus, defendant is entitled to summary judgment on plaintiff's retaliatory discharge claim.

### C.  Mitigation

Defendant makes a final argument in its summary judgment motion that plaintiff is not entitled to back pay or front pay damages because she has failed to mitigate her damages. Because the Court grants summary judgment against all three of plaintiff's Title VII claims, it need not address defendant's damages argument.

### IV.   Conclusion

Viewing the evidence in the light most favorable to plaintiff, no genuine issues of material fact exist that require a trial on any of plaintiff's three Title VII claims.  The Court thus grants defendant's motion for summary judgment as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the defendant's Motion for Summary Judgment (Doc. 75) is granted.

**IT IS SO ORDERED.**

**Dated this 5th day of November, 2015, at Topeka, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**